## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF MICHIGAN

Great Education Initiative,

  Plaintiffs.

v.

United States Department of Education;
Miguel Cardona, in his official capacity
as United States Secretary of Education
or his successor,

  Defendants.

Case No. 2:24-cv-12710-DML-DRG

**Complaint for Declaratory and
Injunctive Relief**

## Complaint for Declaratory and Injunctive Relief

The Plaintiff Great Education Initiative (GEI), through undersigned counsel, alleges the following for its complaint against the above-named federal defendants.

1. The Great Education Initiative, a 501(c)(3) member organization, seeks declaratory and injunctive relief from the enforcement of a rule promulgated by the defendant U.S. Department of Education (and its Secretary-defendant Miguel Cardona) that redefined "sex" within Title IX referred to as the "Final Rule."

2. Although Title IX was originally passed to protect and secure equality for women and girls in educational settings, the new rule, effective as of August 1, 2024, redefined "sex" to include "gender identity." The Final Rule provisions, such as Section 106.10, redefines "discrimination on the basis of sex" to include sex-adjacent

1

characteristics. The Department promulgated the Final Rule without clear Congressional authorization or statutory authorization from the text of Title IX itself.

3.    Some GEI members have sought religious exemptions from Michigan school districts through opt-outs regarding educational classes their children are exposed to that include teachings about gender identity. The opt-outs have been ignored because of the Department's Final Rule. Further, the Final Rule does not provide for religious accommodations, a violation of the Religious Freedom Restoration Act.

4.    The Final Rule, it is alleged, is contrary to the Religious Freedom Restoration Act because it provides for no religious accommodations. Since the Final Rule became effective on August 1, 2024, GEI parents and their children who are public school students have been damaged. The Final Rule is a RFRA-prohibited substantial burden on GEI parents' and their children's right to free exercise of religion in the public schools. Without religious accommodations required by the Congressionally-enacted RFRA, the Final Rule injures GEI parents and their children who are public school students.

5.    Moreover, so expansive is the application of the Department's Final Rule, it can be used to punish parents or others participating in school district events speaking, protesting, or expressing themselves.

6.     As such, among other infirmities of the Final Rule, the Department has violated the First Amendment rights of parents, their children, and exceeded its statutory authority under Title IX.

7.     Furthermore, in this case, the Final Rule is invalid as it is inconsistent with the Department's statutory authority to which it was adopted, is contrary to the legislative intent, and with the Department's expansion of the definition of "sex" adopted a standard beyond the agency's authority, express or implied by Congress.

## Jurisdiction and Venue

8.     This Court has jurisdiction to grant Plaintiff GEI the requested relief under the Administrative Procedures Act, 5 U.S.C. §§ 702, 705-06, the Declaratory Judgments Act, 28 U.S.C. §§ 2201-02, 28 U.S.C. § 1361 and the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2022bb-1(c)..

9.     Venue in the Eastern District of Michigan is proper under 28 U.S.C. § 1391(e)(1) because the defendant Miguel Cardona is an officer of the United States and Defendant Department of Education is an agency thereof. A substantial part of the events or omissions giving rise to the Plaintiff association GEI's claims arose in this district.

10.     A real and live controversy exists between the Plaintiff GEI and The Department.

11.     GEI and its members, including parents and their children in public schools, face imminent harm from the Department's actions.

3

12.     Plaintiff GEI requests a jury trial.

**Parties**

13.     Plaintiff Great Education Initiative (GEI) is a 501(c)(3) nonprofit organization founded and headquartered in Michigan, with associational members. Those members with children typically attend public schools that receive federal governmental moneys. GEI's core activities include, generally, advocating for premium public education to ensure all students have access not only to a high quality education, but with the resources needed to succeed while aligning their education with their family's values. In this regard, GEI engages in various efforts to amplify, protect, establish, and promote the voices, family values, and rights of member parents, their children, and students within school districts, including public school initiatives. This includes, as a core activity, GEI participating in school or school district sponsored or sanctioned events that require providing necessary support for and advocacy on behalf of parents or guardians on issues in which, because of fear of retaliation by school officials against them or in particular children, GEI speaks for them.

14.     In addition, as to one of GEI's core activities, GEI creates, supports, assists, and presents to and for parents, guardians, and families, communications with Michigan school districts referred to as "opt-out forms" that reflect family values and as such, request school districts to recognize accommodations consistent with the

parent's guardian's, or the family's values, including and particularly for most GEI member parents, their religious beliefs.

15.     GEI defines "family values" as the beliefs, ethics, priorities, and worldviews shared by parents (or guardians) of children, and family members. These family values create structure for parents (or guardians), and within a family unit, can define each member's role within the family unit. In this regard, family values help parents and families cope with difficult challenges and to determine right from wrong in complex situations. These shared principles include, but are not limited to, education, parenting styles, and religion.

16.     Many GEI members hold sincerely held religious beliefs, including Christian, Jewish, Islamic and other religious beliefs. Some of those same members use their sincerely held religious beliefs as a central principle within their respective parenting styles or family values in guiding their respective decisions, for example, decisions relating to or affecting education, ethics, priorities, or worldviews, daily activities, or relationships. This includes in the manner in which they communicate with others or choose not to communicate, or to remain silent.

17.     In this regard, GEI members who find the Final Rule contrary to their religious beliefs have told and will tell their children to ignore any school or school district rule or policy that requires them to speak to another person using a pronoun other than what they believe is the person's biological sex. Parents or guardians have told their children to continue to abide by their religious beliefs regarding gender at

any school district sponsored or sanctioned event. The Final Rule prohibits, by requiring discipline, for the children's proposed course of speech, based upon their religious belief.

18.     Further, GEI members who find the Final Rule contrary to their religious beliefs, and participate in school or school district events in which members are in attendance, have and will ignore any school or school district rule or policy that requires them to speak to another person using a pronoun other than what they believe is the person's biological sex. The Final Rule prohibits the GEI members' proposed course of speech, based upon their religious beliefs.

19.     GEI's core belief is that all students should have access to a high quality education with the resources they need to succeed while aligning with their own respective families' values.

20.     As stated, for nearly all GEI members, their family values spring from their deeply held religious beliefs, which include that sex is the basis of "gender" and that therefore, pronouns should be used consistently with an individual's biological sex. Further, exercising their beliefs means that unless there are abundant single-occupant facilities in a school building, school bathrooms and locker rooms should be used consistent with an individual's sex. To this end, GEI, as an organization, has funded research and policy surveys, and has drafted and lobbied for legislation at the state level, as well as locally, for ideal school district policies, for example, a policy to expand access to single-occupant bathroom facilities in schools.

21.     The public debates related to policy decision-making GEI advocates, includes how local schools or school districts can best address issues directly related to "gender identity."

22.     Additionally, part of nearly all GEI members exercising their family values, including religious beliefs, result in decisions for their children to avoid politicized or sex education material and instruction that either does not accord with family values, is not age-appropriate, or both.

23.     In Michigan, parents have a right to communicate with their respective children's school district to seek accommodations consistent with their family values, reflective of their religious beliefs. To this end, as a core activity, GEI provides parents (or guardians), with the means to communicate with school districts, including GEI's opt-out forms. However, GEI believes that the Final Rule provides for no accommodation for such religious beliefs.

24.     The opt-out form is used to seek accommodations to opt-out their children from objectionable politicized or sexualized instruction (or both politicized and sexualized instruction) that does not align with GEI-associational member family values. Exhibit 1.

25.     The GEI opt-out form includes requests for opt-out accommodations for various types of controversial instruction that does not align with GEI family values. The GEI opt-out form asks for GEI member family students to receive an

accommodation to be exempted from instruction in the entire area, or aspects of

human sexuality:

> Human sexuality: Any and all instruction on gender ideology, the physiological (including endocrinological), psychological, and functions of reproductive health as it relates to human sexuality. This opt out includes, but is not limited to: gender identity, gender expression, gender assignment, sexual identities, sexual expression, sexual attraction, sexual orientation, gender fluidity, transitioning, and explicit sexual activity or behavior. Therefore I/we opt out of:
>> ▪ Teaching, discussion, or lessons with explicit heterosexual sexual acts, fantasies, self-pleasure, or self-exploration;
>> ▪ Teaching, discussion, or lessons on Reproductive Health;
>> ▪ Teaching, discussion, or lessons on Sexually Transmitted Diseases;
>> ▪ Teaching, discussion, lessons, or events on Abortion;
>> ▪ Teaching, discussion, or lessons where pronouns are defined different than biology, or using his/her alternate pronouns as a meaning of redefining gender apart from biology;
>> ▪ Use of pronouns for my student that does not match the student's biological sex as listed in the enrollment documents;
>> ▪ Teaching, lessons, or discussions about transsexual healthcare, including hormone blockers, enhancers, and gender modification surgeries;
>> ▪ Teachers, staff, or administrators, displaying or distributing sexuality/gender paraphernalia like LGBTQ+ flags, trans flags, or gay pride stickers;
>> ▪ Teachers, staff, or administrators displaying or distributing the gender bread person, gender unicorn, gender snowperson, or a similar gender teaching metaphor;
>> ▪ Exposure to books in elementary classroom libraries with storylines about young children transitioning, changing their identity, questioning their gender, participating in or witnessing explicit sexual activity;
>> ▪ Teaching, lessons, or discussions of any of the family planning or sexuality topics listed in this document utilizing the morning announcements by school staff, students or any outside organization or affiliate;
>> ▪ Teaching, lessons, or discussions in gender/sexuality social justice or gender/sexuality activism;

▪ Given access to, instructions, discussion, or invitations to, a gender affirmation closet;

▪ Teaching, lessons, or discussion encouraging students to participate in, accept, or understand cross-dressing or transsexual behavior;

▪ Use, instruction, discussion, or teaching of gender neutral bathrooms or gender neutral locker rooms or any bathroom or locker room where persons of the opposite, physical, sex are permitted;

Teaching, lessons, planning, or discussions concerning a student in the creation, modification, or management of a gender support plan;

▪ Reading assignments or access to books containing any sexuality or family planning themes listed in this document;

▪ DEI or SEL sessions, teaching, discussions, or lessons that introduce trans and non-binary genders as protected classes of people;

▪ Teaching, lessons, or discussions in the form of advertising or promotion for after school programs that discuss or teach gender identity/expression, sexual identity, sexual orientation, or any of the items included in this document;

▪ All surveys, polls, or questionnaires that contain questions about any of the subjects listed in this document or aspects of the student's family life;

▪ Reading selections or assignments that condone the violation of the laws of this state pertaining to sexual activity;

▪ Displaying, directing to, or informing students of sex education websites or apps that allow students access to sex education information that is for all ages not just information that is age appropriate for them.

▪ Access to books/materials in the classroom libraries with references to non-biological gender identities or storylines containing any type of non- heterosexual relationships, and/or explicit sexual activities of any kind;

▪ School wide activities that teach, discuss, or promote concepts about gender or sexual identities, gender or sexual expression, or other gender concepts such as LGBTQ+ Pride Week or Transsexual Week; and

▪ School-provided or referred onsite or offsite counseling relating to reproductive health which is defined as "that state of an individual's well- being which involves the reproductive system

and its physiological, psychological, and endocrinological functions" - this would include gender transitioning.

Exhibit 1 at 2–3.

26.     GEI's member families in Michigan are numerous, widespread, and similarly situated.

27.     GEI member families have children enrolled in many local school districts and intermediate school districts in Michigan, which are responsible for budgeting and passing-through funding from the State and Federal governments.

28.     Federal funds are linked to Title IX compliance.

29.     Defendant U.S. Department of Education ("Department") is an executive department of the United States, and it is responsible for federal administration of education. The Department is responsible to administer and enforce Title IX. The Department is also responsible for revising and promulgating the 2024 Final Rule under Title IX at issue in this case.

30.     Defendant Miguel Cardona is sued in his official capacity as Secretary of Education.

## Factual Background

31.     Title IX, passed by Congress in 1972, is codified under 20 U.S.C. § 1681(a), is accurately quoted in-part as follows: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of,

10

or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"

32. The text of Title IX refers to "sex" and "both sexes" throughout, which refers to a biological male-female dichotomy. For example, the text at (a)(2), refers to admission of students of "both sexes," (a)(5) discusses admitting students of one sex, and (a)(7) regards Boy or Girl conferences.

33. GEI believes that the text of Title IX, as passed by Congress asserts there are two sexes, male and female, boy and girl.

34. GEI believes that the text of Title IX makes no reference to "gender," or "gender identity."

35. GEI believes that in the text of Title IX, Congress explicitly allows schools to recognize and consider sex in numerous situations. *See, e.g.*, 20 U.S.C. § 1681(a)(6) and (7) (exempting fraternities, sororities, YMCAs, YWCAs, Boy Scouts, Camp Fire Girls, American Legion conferences related to Boys State conferences and Boys Nation conferences, among other examples).

36. GEI believes that members of Congress have recognized that Title IX only refers to "sex" and not "gender identity." Congressional members have proposed legislation to change the text of Title IX to include "gender identity," as found for example, *Fairness for All Act*, H.R. 1440, 117th Congress (2021). However, all attempts to include the term "gender identity" to Title IX have failed in Congress.

37.     The U.S. Department of Education ("Department") is the federal agency that promulgates regulations to execute Title IX. For example, some of these regulations are found in the Title 34 of the Code of Federal Regulations, Subtitle B, Part 106. Some of these regulations, for example, at 34 C.F.R. § 106.31 (2023), reiterate the text of Title IX:

> [N]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance.

34 C.F.R. § 106.31 (2023).

38.     GEI believes that the Title IX prohibition on discrimination on the basis of sex is not a prohibition on classification or separation on the basis of sex. For example, separation between the sexes in some areas and situations, particularly where individuals are vulnerable (e.g., in a state of undress, or sleeping), is allowed. In particular, the Department permits educational institutions to provide separate housing for males and females, provided that the

> [h]ousing provided by a recipient to students of one sex, when compared to that provided to students of the other sex, shall be as a whole:
> (i) Proportionate in quantity to the number of students of that sex applying for such housing; and
> (ii) Comparable in quality and cost to the student.

*Id.* § 106.32(a)–(b); *see also* 20 U.S.C. § 1686.

39.     The Department also permits federal financial assistance recipients to "provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

40.     The Department's athletics regulation is similar:

> [N]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

*Id.* § 106.41(a).

41.     The Department's athletics regulation also allows a federal financial assistance recipient to separate the sexes in the context of athletics under certain circumstances:

> Notwithstanding the requirements of [34 C.F.R. § 106.41(a)], a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

*Id.* § 106.41(b).

42.     GEI believes that the text of Title IX authorizes sex-separate sports as long as men and women have equal opportunities.

43.     GEI believes that overall, the Department's regulations repeated references to "sex" have recognized a male-female dichotomy. *See, e.g.*, 34 C.F.R. § 106.41(b) (referring to "one sex" and "the other sex").

44.     On July 12, 2022, the Department published a Notice of Proposed Rulemaking titled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" (the "Proposed Rule"). The Proposed Rule was published in the Federal Register at 87 Fed. Reg. 41390–579.

45.     GEI believes that the Proposed Rule supposedly "clarified" the Department's opinion that "sex discrimination includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 87 Fed. Reg. 41391.

46.     GEI believes that the Proposed Rule prohibited "sex-based harassment," which the Department asserted included a "broader range of sexual misconduct than that covered under the definition of 'sexual harassment' in the current regulations." *Id.* at 41413.

47.     The Department also recognized its proposed definition was "more similar to the definition of 'hostile environment' under Title VII than the definition of 'sexual harassment' under the current Title IX regulations." *Id.* at 41,415.

14

48.     GEI believes that although the Department's proposed rule was widely criticized during the public comment period, the Department nevertheless continued to proceed to a "Final Rule" that changed 34 C.F.R. § 106 in ways that were substantially similar to the criticized Proposed Rule. 89 Fed. Reg. at 33474. Indeed, like the proposed rule, the Final Rule purports to "provide greater clarity regarding: the definition of 'sex-based harassment'; the scope of sex discrimination, including recipients' obligations not to discriminate based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity; and recipients' obligations to provide an educational environment free from discrimination on the basis of sex." *Id.* at 33476.

49.     The Department issued its administrative rule on April 29, 2024 under the title "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" (the new Title IX "Final Rule"). The Final Rule was published in the Federal Register at 89 Fed. Reg. 33474–778. A 423-page PDF copy of the Final Rule is available online at https://www.govinfo.gov/content/pkg/FR-2024-04-29/pdf/2024-07915.pdf.

50.     GEI believes that the Final Rule alters the definition of "sex" to include "gender identity" for the purpose of Title IX without authorization within the text of Title IX.

51.     GEI believes that the Final Rule alters the definition of "sex" to include "gender identity" in-part by extending Title IX's prohibition on discrimination on the

basis of sex to also include discrimination on the basis of "gender identity." *E.g.*, 89 Fed. Reg. 33477.

52.     GEI believes that, as is relevant here, this part of the Final Rule makes three major changes, none of which GEI believes are authorized by Title IX: (1) it changes the definition of "sex" to include "gender identity"; (2) it changes the standard for what constitutes sexual harassment; and (3) it changes the person to whom a school may be liable for discrimination.

53.     GEI believes that first, the Final Rule "interprets" Title IX's prohibition on discrimination on the basis of sex to include discrimination on the basis of "gender identity." *Id.* at 33477.

54.     The Department states that "gender identity" is "an individual's sense of their gender, which may or may not be different from their sex assigned at birth," but also says it is "unnecessary to articulate a specific definition of 'gender identity.'" *Id.* at 33809.

55.     GEI believes that the Department, through its Final Rule, recognizes that sex and "gender identity" are different.

56.     The Department, through its Final Rule, also asserts that there are more than two "gender identities" through removing references to "both sexes" throughout its Final Rule regulatory text. *See id.* at 33804–05.

57.     GEI believes that the Department included an unexhaustive list of categories that could be considered when determining whether discrimination is "sex-

16

based": "lesbian, gay, bisexual, transgender, queer, questioning, asexual, intersex, nonbinary, or describe their sex characteristics, sexual orientation, or gender identity in another similar way." *Id.* at 33803. None of these terms are specifically defined. *Id.* Additionally, sexual orientation disorders are fairly included within the broad language of the April 29 rule.

58. Additionally, GEI believes that the Final Rule relies on the *World Professional Association for Transgender Health, Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, 23 Int'l J. Transgender Health S1 (2022), which recognizes dozens of "gender identities" including "eunuch," "nonbinary," "transgender," "gender nonconforming," "gender queer or diverse," "gender diverse," "third gender lying beyond the gender binary," "two spirit," and many others that are not widely recognized in the United States. The Final Rule does not account for, provide guidance concerning, or limit liability with respect to, any "gender identity" outside the "gender binary."

59. GEI believes the Final Rule would require educational institutions to take a person at their word as to their "gender identity" without documentation or questioning. *Id.* at 33819.

60. GEI believes the Final Rule provides no guidance for ascertaining a person's "gender identity" if the information is not volunteered. In fact, "requiring a student to submit to invasive medical inquiries or burdensome documentation requirements to participate in a recipient's education program or activity consistent

with their gender identity imposes more than de minimis harm." *Id.* at 33819

(emphasis added). The Final Rule considers requesting a birth certificate to be a

"burdensome documentation requirement." *Id.*

61.    GEI believes that the Final Rule acknowledges that "gender identity"

may not be known or readily knowable. *Id.* at 33809. Nevertheless, the Final Rule

states "a recipient must not treat individuals more or less favorably based on their

gender identity" and "may not prevent a person from participating in its education

program or activity consistent with the person's gender identity," *id.*, which, again,

may not be known or readily knowable. Thus, an educational institution may

"discriminate" against a student—risking federal funding and civil liability— without

even knowing it is discriminating, especially considering that the Final Rule assumes

there are multiple "gender identities."

62.    GEI understands that the Final Rule impacts how schools where GEI

member families have children enrolled may be liable for discrimination. For example,

GEI believes that previously, a school would not be liable for discrimination under

Title IX unless the school has actual notice of the discrimination. However, under the

Final Rule, a school could be liable for "discrimination" if it knows it has male-only

and female-only restrooms (and knows males cannot use the female restroom and

vice versa) even if it does not know if any student, applicant, visiting student, parent,

teacher, staff member, or other visitor has a "gender identity" that does not match his

or her biological sex.

63.    GEI understands that the Final Rule claims that it "clarifies" that a school may be liable for "discrimination" if it "carr[ies] out any otherwise permissible different treatment or separation on the basis of sex in a way that would cause more than *de minimis* harm, including by adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with their gender identity." 89 Fed. Reg. at 33818 (emphasis added).

64.    GEI believes this is a departure from the previous interpretation of "discrimination," which requires a showing of "unwelcome conduct that a reasonable person would determine is 'so severe, pervasive, and objectively offensive' that it effectively denies a person equal access to education." 85 Fed. Reg. 30065 (the May 2020 version of the title IX regulatory rule). This definition applies to both civil liability and administrative enforcement. See 34 C.F.R. § 106.2 (defining "Hostile environment harassment").

65.    GEI believes the Final Rule acknowledges that, even if the standards for administrative enforcement can be or are different than those used for civil liability, it "does not mean [ ] administratively imposed remedial actions can never have financial consequences." 89 Fed. Reg. at 33499 n.10.

66.    GEI understands that the Final Rule "clarifies" the definition of "person" to whom the school may be liable for discrimination (the "Complainant") and includes any student, employee, or any other person who "was participating or

19

attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination." *E.g.*, *Id.* at 33882.

67.     GEI believes schools where GEI member families are enrolled may be liable for "discriminating" against students, parents of students, applicants for admission, parents of applicants, parent chaperones, visiting students, parents of visiting students, teachers, employees, coaches, visiting coaches, independent contractors, guests of the school, and others. *Id.* GEI believes that liability for allegations of discrimination includes it as an organization as it engages in its core activities with parent, guardians, schools, and school districts.

68.     The Final Rule declines to define "specific conduct and practices that constitute . . . gender identity discrimination," *id.* at 33808, but does provide some instances in which a school would likely be found to be discriminating if it treats a person according to his or her sex rather than "gender identity." GEI believes that these instances reveal how broad and vague these conduct or practices could be.

69.     Furthermore, the public debates related to policy decision-making GEI advocates, includes how local schools or school districts can best address issues directly related to "gender identity." But, the Final Rule has closed those debates for local governmental decision-making and organizational or parental influence on local policy decisions.

70.     For example, the Final Rule acknowledges that students have a "legitimate interest" in "safety and privacy" of sex-separate facilities (such as restrooms, locker rooms, and overnight accommodations). *Id.* at 33820.

71.     However, the Final Rule goes on to state these "concerns" are "unsubstantiated and generalized." *Id.* at 33820. Further, "students experience sex-based harm that violates Title IX when a recipient bars them from accessing sex-separate facilities [including restrooms, locker rooms, and overnight accommodations] or activities consistent with their gender identity." *Id.* at 33818. Any "such harm cannot be justified or otherwise rendered nondiscriminatory merely by pointing to the fact that, in general, there are physical differences between the sexes." *Id.* at 33819.

72.     The Final Rule repeatedly refers to prior "Dear Colleague" Letters, including the 2016 Dear Colleague Letter, where the Department advised recipients that they must treat a transgender female-identifying student the same as a biological female student for the purposes of accommodations on overnight school trips. 2016 Dear Colleague Letter at 4.3, available at https://sites.ed.gov/idea/files/dcl-on-pbis-in-ieps-08-01-2016.pdf.

73.     GEI believes that because the Final Rule is in effect in GEI member school districts, the Final Rule requires that schools permit biological males (including students, visiting students, applicants, their parents, teachers, staff, contractors, visitors, and others) to access female-only facilities (including restrooms, locker

rooms, and overnight accommodations) without question (and vice versa), or else the school risks losing its federal funding.

74.     As another example, GEI believes that the Final Rule would make clear that schools can no longer separate students based on biological sex for "classes or portions of classes." *Id.* at 33819. This would include gym class and health and sexual education classes.

75.     As another example, while the Final Rule claims to maintain First Amendment protections, *id.* at 33803 (suggesting nothing in the Final Rule requires an educational institution to violate free speech rights), GEI believes that the Department has already taken the position that educational institutions are at risk of losing federal funding (and at risk of civil liability) if a teacher does not use a student's "preferred pronouns" for any reason, even if the teacher did not know that the student's "gender identity" differed from his or her biological sex or if the teacher had a free speech or religious liberty objection. *See* 2016 Dear Colleague Letter at 3. GEI believes that the Final Rule would likely also apply to completely innocuous speech such as the statement that "there are only two genders."

76.     GEI believes that the Final Rule would lower the standard for harassment to include "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33884 (emphasis added).

22

77.  Moreover, the Final Rule makes no provision for the accommodation of religious beliefs of either the parent (or guardian) or the student or both.

78.  In this regard, the Final Rule has negated or nullified the GEI opt-out form to seek accommodations from schools within school districts on the basis of religious beliefs. GEI has communicated the effect of the Final Rule within schools and the board and vague punishments mandated under the Rule for schools or school districts, or both, to advance with a violation of the Final Rule is determined. In this regard, with the negating or nullifying of the GEI opt-out form used to seek religious accommodations as directly related to the Final Rule, parents (or guardians) have forgone their communications with schools. The Final Rule has caused damage to GEI because the parental out-opt form is a core activity of GEI.

79.  Significantly, the Final Rule mandates school districts to identify "disciplinary sanctions" for those found to have violated the Final Rule as a violation of Title IX. "Disciplinary sanctions" will vary from school district to school district.

80.  For example, female students who raise concerns about having to share a locker room with a male athlete or a restroom with a male visiting parent are at risk of facing investigation, disciplinary proceedings, and sanctions for "hostile environment harassment" because, under the Final Rule their words are offensive, severe, or pervasive under the current Final Rule's application of what is harassment.

81.  Similarly, GEI believes that the Final Rule is so vague and broad that students would self-censor for fear that their speech on topics such as gender identity,

23

sex stereotypes, and sex characteristics could fall within its new definitions and standards.

82.     Similarly, under the Final Rule and its directives affecting those individuals within the educational institution, parents must instruct their children not to complain to school officials for fear of reprisal, punishment, or retaliation thus, making the school environment less safe as an educational institution for their child, because there is no accommodation for their respective religious believes.

83.     Likewise, the Final Rule reaches school district approved or sanctioned events in which parents attend and are subject to punishment by school officials when expressing opinions or making statements or otherwise participating in such events in a way reflecting their religious beliefs but conflicting with the Final Rule.

84.     GEI believes that the Final Rule compels speech from teachers, school employees, parents, and students, in that it would require them to use an individual's "preferred pronouns" and names of choice, forcing them to affirm gender identity and transgender ideology contrary to their personal beliefs and family values, including their religious beliefs.

85.     GEI believes that the Final Rule compels speech from students and parents, in that it would require students and parents to use teachers' and school staffs' honorifics that do not match their sex, or use "neo-honorifics" such as "Mx" forcing them to affirm gender identity and transgender ideology contrary to their personal beliefs and family values, including their religious beliefs.

86.    GEI believes that the Final Rule ostensibly would maintain "current regulations on athletics," which do allow female-only and male-only sport teams. *Id.* at 33817.

87.    However, the Final Rule, GEI believes, would also apply to all "discrimination" (as the Final Rule now defines it) "except as permitted by 20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations at [34 C.F.R.] §§ 106.12 through 106.15, 20 U.S.C. 1686 and its corresponding regulation [34 C.F.R.] § 106.32(b)(1), or § 106.41(b)." *Id.* at 33817. The Final Rule does not except 34 C.F.R. § 106.41(a), which prohibits discrimination "in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient," and says "no recipient shall provide any such athletics separately on such basis."

88.    GEI believes that the Department's present position maintains that "the Title IX regulation permitting schools to separate certain athletic teams by sex does not authorize categorical bans on transgender girls' participation in girls' sports." Brief of Amicus United States of America, *B.P.J. v. West Virginia*, 98 F.4th 542 (4th Cir. 2024) at 21; cf. U.S. Dept. of Justice and the Department 2016 Dear Colleague Letter on Transgender Students at 3.

89.    According to the Department, any "categorical ban" on biological males' participation in female-only sports "is inconsistent with Title IX's overarching goal of ensuring equal opportunity." Brief of Amicus United States of America, *B.P.J.*, 98

F.4th 542, at 12. The brief stated that "prohibiting [biological males] from participating on girls' sports teams because their sex assigned at birth was male" causes "harm" and constitutes discrimination on the basis of sex. *Id.*

90.    GEI believes the Final Rule's assertion that a separate regulation will address athletics is misleading because, "[the Department] has indicated that it would consider in a forthcoming notice of proposed rulemaking (NPRM) what criteria, if any, recipients should be permitted to use to establish students' eligibility to participate on a particular male or female athletic team." *Id.* at 29. ( Emphasis added).

91.    Therefore, GEI believes the Department's default position is that no separation based on athletics is permitted on the basis of sex but further guidance may provide some criteria for limited exceptions to that general rule. The lack of separate guidance identifying such exceptions naturally means that there are no exceptions based on the Final Rule.

92.    The Final Rule also reveals that the Department considers it a violation of Title IX when a school engages in "impermissible" "sex-stereotyping" by making decisions "based on 'paternalism and stereotypical assumptions about women's interests and abilities,' and a 'remarkably outdated view of women and athletics.'" *Id.* at 33811 (quoting *Pederson v. La. State Univ.*, 213 F.3d at 858, 880 (5th Cir. 2000)).

93.    GEI believes that the Final Rule does not explain why sports are exempted if the relative difference in boys' and girls' athletic abilities is only a "sex-stereotype" which cannot be relied on to separate students based on sex.

26

94.     GEI believes the Department will use the Final Rule to prohibit blanket bans on biological males competing on and against female-only athletics teams, requiring schools to allow men to play on women's teams.

95.     The Final Rule does not provide any guidance as to how schools are to decide which males must be permitted to play on female teams or how to avoid "sex-stereotyping" in this area.

96.     The Final Rule does not provide any guidance as to whether female athletes are permitted to withdraw or otherwise decline to compete against male athletes if they reasonably fear bodily injury, or if such conduct would constitute discrimination.

97.     GEI believes that the Final Rule does not provide any guidance to schools as to how to maintain competitive fairness for female athletes when other schools field male athletes with an obvious competitive advantage. (For example, a male 18-year old male Senior in High School who begins to identify as female).

98.     GEI believes that the Final Rule does not provide any guidance to schools, including schools in Michigan where GEI member families have children enrolled, as to how to classify "gender-fluid" or "two-spirited" athletes who wish to compete on both male and female teams.

99.     GEI believes that the Final Rule does not provide any guidance to schools, including schools in Michigan, where GEI member families have children enrolled, as to how to classify, for athletics purposes, "non-binary" students who

27

decline to participate as either male or female, because they insist that they fall into neither category.

100.    The Final Rule notes only in passing the Department's prior contrary position. *See* 89 Fed. Reg. at 33804.

101.    Just before the effective date of the Final Rule, on August 1, 2024, through a separate legal action, joined by 20 states (Michigan was not a party), the federal district court enjoined the Department from enforcing this interpretation against twenty states because of the case *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 842 (E.D. Tenn. 2022), but states that the Department "disagrees" with the Court's reasoning in that case. 89 Fed. Reg. at 33804.

102.    GEI is aware that on June 14, 2024, the U.S. Court of Appeals for the Sixth Circuit upheld the district court's grant of a preliminary injunction in *Tennessee v. U.S. Dep't of Educ.*, 104 F.4th 577 (6th Cir. 2024). GEI believes the Sixth Circuit confirmed the Department's guidance (the Final Rule) constituted a "final agency action" imposing new legal obligations on states without adhering to the Administrative Procedures Act's rulemaking procedures. GEI believes the court also recognized that this guidance contradicted existing federal and state laws that maintain sex-based distinctions in areas such as bathrooms, locker rooms, and sports teams.

103.    GEI also understands that the Department is also enjoined from enforcing the Final Rule in over 20 states, but not Michigan.

104.    The U.S. District Court for the Eastern District of Tennessee issued a preliminary injunction against the Final Rule on June 17, 2024. In *Tennessee v. Cardona*, No. CV 2: 24-072-DCR, 2024 WL 3019146, at *44 (E.D. Ky. June 17, 2024) (granting injunctive relief to the states of Tennessee, Kentucky, Ohio, Indiana, Virginia, and West Virginia.). GEI believes the injunction has continuing effect for the states of Tennessee, Kentucky, Ohio, Indiana, Virginia, West Virginia. *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024) (denying motion to stay injunction). *See also, Dept. of Educ. v. Louisiana*, 603 U.S. 866, 868 (2024) (denying Government's applications for partial stays).

105.    GEI understands that the federal district court in Louisiana also granted a preliminary injunction against the Final Rule for the states of Louisiana, Mississippi, Montana, and Idaho. *Louisiana v. U S Dept. of Educ.*, No. 3:24-CV-00563, 2024 WL 2978786 (W.D. La. June 13, 2024). GEI believes the preliminary injunction continues in effect. *Louisiana by and through Murrill v. U.S. Dept. of Educ.*, No. 24-30399, 2024 WL 3452887, at *1 (5th Cir. July 17, 2024) (denying motion for partial stay).

106.    GEI understands that in *Arkansas v. U.S. Dept. of Educ.*, No. 4:24 CV 636 RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024) granted a preliminary injunction against the Final Rule for the states of Arkansas, Missouri, Iowa, Nebraska, North Dakota, South Dakota.

107.    GEI understands that in *Carroll Indep. Sch. Dist. v. U.S. Dept. of Educ.*, No. 4:24-CV-00461-O, 2024 WL 3381901, at *8 (N.D. Tex. July 11, 2024) the federal

district court granted preliminary injunctive relief that it believes still remains in effect against the Final Rule. Currently, litigation in that case continues with cross-motions for summary judgment.

108.    GEI understands that although the federal district court denied injunctive relief for the plaintiffs Alabama, Florida, Georgia, South Carolina (among other private organizations and groups), *Alabama v. Cardona*, No. 7:24-CV-533-ACA, 2024 WL 3607492, at *17 (N.D. Ala. July 30, 2024), the United States Court of Appeals for the Eleventh Circuit granted injunctive relief pending appeal.

109.    Similarly, GEI understands that in *Kansas v. U.S. Dept. of Educ.*, No. 24-4041-JWB, 2024 WL 3273285, at *5 (D. Kan. July 2, 2024), the federal district court granted preliminary injunctive against the Final Rule for plaintiff-states and organizations including Kansas, Alaska, Utah, Wyoming, K.R., a minor of Shawna Rowland, her Mother; Moms for Liberty; and Young America's Foundation. GEI also notes that, similar to at least one organization in *Kansas,* Michigan's chapter for Moms for Liberty, its members also have children enrolled in Michigan schools and are affected by the Final Rule.

110.    GEI found that while the Final Rule acknowledges that the Department cannot interfere with a person's religious liberty rights or rights under RFRA, the Final Rule does not provide any exemption to accommodate religious students, teachers, staff, administrators, coaches, and others. Instead, the Department "will

investigate" all complaints and make individual determinations when a person cannot comply with the Final Rule due to his or her religious belief. 89 Fed. Reg at 33809.

111.    GEI believes that the Final Rule implicates the Spending Clause. In this regard, GEI believes that under the Spending Clause, federal governmental power is not unlimited but subject to several general restrictions. Here, Michigan public schools receive federal funding. Hence, Title IX was passed pursuant to Congress's power to impose conditions on recipients of federal funds under the Spending Clause.

112.    However, GEI believes Title IX does not contain the "unmistakably clear language" required to justify the interpretation in the Department's Guidance Documents.

113.    GEI believes that the portion of funding tied to Title IX Final Rule compliance is so significant to each Michigan school district that the districts are unduly coerced into complying with the Final Rule for fear of losing funding, which GEI believes violates the Spending clause.

114.    GEI believes the Final Rule suggests "Federal agencies have authority to define the contours of the Spending Clause contract with recipients through their regulations." See *id.* at 33517. However, GEI believes federal agency authority is limited by the text of Title IX.

115.    GEI also believes the Final Rule clashes with other parts of Title IX as well, such as 20 U.S.C. § 1688 "Neutrality with respect to abortion." For example, the Final Rule requires that educational institutions "treat pregnancy or related conditions

as any other temporary medical conditions for all job-related purposes, including

commencement, duration and extensions of leave; payment of disability income;

accrual of seniority and any other benefit or service; and reinstatement; and under any

fringe benefit offered to employees by virtue of employment." *Id.* at 33796.

116.    The Final Rule defines "pregnancy or related conditions" to mean

pregnancy, childbirth, termination of pregnancy." Termination of pregnancy includes

voluntary abortion. *Id.* at 33575.

117.    The Final Rule also requires educational institutions to provide a woman

who has had or who is recovering from an abortion access to all education programs

and activities which could include access to online or homebound instruction during

recovery from an abortion, providing a student additional time to complete an exam

or coursework if a student travels out of state for the abortion. *Id.* at 33777.

118.    The Final Rule requires educational institutions to offer women

obtaining abortions "Reasonable Modifications" of policies, practices and procedures

to ensure equal access (i.e. to facilitate their abortions), including "intermittent

absences to attend medical appointments; access to online or homebound education;

changes in schedule or course sequence; extensions of time for coursework and

rescheduling of tests and examinations." *Id.*

119.    The Final Rule provides for girls or women obtaining abortions must

also be allowed a voluntary leave of absence, along with reinstatement "to the

32

academic status and, as practicable, to the extracurricular status that the student held when the voluntary leave began." *Id.*

120.   The Final Rule provides that students obtaining an abortion must be treated "in the same manner and under the same policies as any other temporary medical conditions with respect to any medical or hospital benefit, service, plan, or policy the recipient administers, operates, offers, or participates in with respect to students admitted to the recipient's education program or activity." *Id.*

121.   Thus, the Final Rule requires educational institutions to provide leave, disability, and other benefits in connection with abortions that GEI believes is in direct conflict with Title IX's neutrality clause under 20 U.S.C § 1688 ("Nothing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion. Nothing in this section shall be construed to permit a penalty to be imposed on any person or individual because such person or individual is seeking or has received any benefit or service related to a legal abortion.").

122.   Moreover, the Department's Final Rule redefines, if not rewrites Title IX to change the definition of "sex" and to require schools to provide benefits for abortion, in such a way that it changes current regulations in problematic ways that harm GEI as an associational organization, as well as GEI members and their families.

123.   GEI believes that "gender identity" is not a statutorily cognizable identity category.

124.   GEI believes that "gender identity" is subjective.

125.   GEI believes that the sole criterion used to determine "gender identity" apparently is whether one says one is transgender.

126.   GEI believes that unlike biological sex, "gender identity" is not a static or an immutable characteristic "determined solely by accident of birth." And the Final Rule would require schools to take people at their word as to their "gender identity."

127.   GEI believes that there is also the issue of gender fluidity in which students or others may switch between genders with which they identify.

128.   Lastly, GEI believes that "gender identity" is not limited to a male/female dichotomy. Depending on whom is asked, gender identity covers individuals who identify with any of the following gender identities: "boygirl," "girlboy," "genderqueer," "eunuch," "bigender," "pangender," "androgyne," "genderless," "gender neutral," "neutrosis," "agender," "genderfluid," "third gender," and others. *See generally World Professional Association for Transgender Health, Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, 23 Int'l J. Transgender Health S1 (2022).

129.   Indeed, GEI found that a third of the respondents to the 2015 National Transgender Discrimination Survey (a survey in which all respondents "identif[ied] as transgender") reported their "primary gender identity" as either "part time as one

34

gender, part time as another" or some gender other than male or female. Jamie M. Grant et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* 16 (2015). Each and every time an individual's "gender identity" changes, GEI member parents and their children are at risk of discriminating by treating the individual according to his or her biological sex (or according to his or her former "gender identity"), regardless of whether or not they are aware of the change.

130.    The Final Rule irreparably harms and damages GEI and its member parents or guardians, individual members, and families when participating or attending any school or school district sponsored or sanction event in Michigan.

131.    GEI member families come from a variety of religious backgrounds. GEI families live in cities, suburban towns, and rural areas. They have children enrolled in public school districts that all accept Title IX funding, most as a substantial part of their school district's budget. Many GEI member families have children enrolled in athletics, music programs, theater, and other extracurricular activities. Most GEI member families who have middle school or high-school-aged children are enrolled in physical education classes that require them to change clothes at school in locker rooms shared with other students.

132.    Almost all of the GEI member families have children who are vulnerable to exposure in states of undress in their public school bathrooms. This is because most of the public school bathrooms at any level throughout Michigan are only partially private, multi-stalled bathrooms with stall doors having spaces above, below,

or to each side of the stall door that may expose individuals in various states of undress.

133.   GEI has member parents who are afraid of speaking, or being named as Plaintiffs, or even as examples of GEI members in a lawsuit. These parents and families fear community retaliation from their children's schools, teachers, and bullying by classmates. These GEI member parents also fear being accused of sexual harassment under the Final Rule if they speak in accord with their beliefs about the truth of sex and "gender identity," marriage, abortion, sexual orientation.

134.   Part of GEI's organizational mission is to advocate for policies and curriculum that provide excellent public education while working with, and honoring a student's own family values. The Final Rule is a present barrier for GEI to fulfill its organizational mission. For example, the public debates related to policy decision-making GEI advocates, includes how local schools or school districts can best address issues directly related to "gender identity." But, the Final Rule has closed those debates for local governmental decision-making and organizational or parental influence on local policy decisions.

135.   Part of GEI's organizational mission is to assist parents and school districts to work together to facilitate parents opting-out of objectionable education instruction, particularly sexual education instruction related to "gender identity," or marriage that is not between one man and one woman, etc. Because school districts

believe they must follow the Department's Final Rule, the Final Rule is causing injury, harm and damages to GEI in its opt-out mission.

136.    The Department's comments to the Final Rule stated that the Department's Office of Civil Rights ("OCR") would address complaints of sex discrimination and discrimination based on "gender identity," consistent with OCR's jurisdiction under Title IX and the final regulations in institutions controlled by religious organizations. 89 Fed. Reg. 33837; *id.* at 33847–848.see

137.    The Final Rule also states that "OCR [will] evaluate and, if appropriate, investigate and resolve consistent with these regulations' requirements that a recipient not discriminate against parties based on sex," including gender identity. *Id.*

138.    Michigan public schools and school districts have aligned themselves to implement the Final Rule. *See e.g.,* Thrun, *Title IX Status Update*, (July 26, 2024), https://www.thrunlaw.com/news/title-ix-status-update (last visited Oct. 14, 2024). GEI member families have children enrolled in Michigan schools. Likewise, most parents (or guardians) of those same children also participate in school district supported or sanctioned events.

139.    The Final Rule has nullified or voided the purpose of GEI's opt-out form and thus, eliminated the state statutory right of parents or guardians to communicate with school officials to seek accommodations for their children based upon their religious beliefs as it relates to "gender identity." The Final Rule has directly interfered with GEI's core activities as it relates to advocacy for parental

rights relating to and regarding accommodations for their children based upon religious beliefs within schools and school district events or activities. In short, the Final Rule has caused injury, harm and damages to GEI's core activities, including advocating for parental opt-outs from objectionable teaching related to sex education that occurs in heath classes and courses other than health classes, and instruction related to "gender identity," and for children to be educated at school in keeping with their own family's values.

140.    As a result, GEI members and their member families, based on their respective religious beliefs, will and have instructed their children to refrain from participating in classroom instructions that are objectionable teachings related to sex education that occurs in heath classes and courses other than health classes, involving "gender identity" that is contrary to their family values, reflective of their religious beliefs. Under the Final Rule, this is discrimination, subject to "disciplinary sanctions."

141.    Likewise, GEI members who engage in school or school district supported or sanctioned events, will not refrain from identifying individuals based upon their biological sex, and not identify a person based upon that person's "gender identity" because it is contrary to their respective family values, particularly as it relates to their respective religious beliefs. Under the Final Rule, this is discrimination subject to "disciplinary sanctions."

142.    For example, GEI member Jane Krug is the mother of two daughters, an 18-year-old who recently graduated high school, and a 15-year-old who is currently

in 10th grade in Forest Hills Central High School, located in Grand Rapids, a city in Kent County Michigan. Schools within the Forest Hills school district receive Title IX funding.

143.   Like many GEI members, Jane Krug is Catholic, and has strongly held beliefs rooted in her family values that includes her religious faith. In this regard, and based upon her values, Jane believes that the use of pronouns reflecting what she would describe as the truth of an individual's sex at birth and not their "gender-identity." This is because she believes that all people should be treated with dignity and respect, and God created every person male or female, and that people should accept their God-given sex and not seek to reject or change it. Part of her exercise of religion is to speak to her truth, which means to her that she cannot use pronouns which would affirm an individual's transgender self-identification because to use pronouns that do not accord with the individual's God-given sex would be sinning against God and bearing false witness against, and about that individual.

144.   Like many GEI members, Jane Krug also works as a substitute teacher in the Forest Hills School District. During the course of working as a substitute teacher, and in accordance with her deeply held Catholic and free speech beliefs about expressing the truth, Jane Krug will use pronouns that accord with students' biological sex as she perceives that sex. Because of the Final Rule, Jane Krug is subject to disciplinary sanctions when she encounters individual students, fellow school employees, or others at school that self-identify with a "gender" that does not

correspond with their sex and does not adhere to the person's "gender identity." In instances in which Krug will necessarily speak about a person without knowing the individual's name, she will have to remain silent if the person's "gender identity" does not correspond with their sex. Thus, her religious exercise is burdened because she is compelled to speak or refrain from speaking. Moreover, Krug can refuse to speak, meaning refuse to use the "gender identity" of a person, yet to refuse to speak will subject Krug to disciplinary sanctions under the Final Rule as a form of discrimination.

145.    Like many GEI families, Jane Krug's daughter who is still in school at Forest Hills Central High School shares her mother's Catholic faith and religious beliefs about sex, "gender identity," and pronoun usage. Krug's mother has told Jane to use the pronoun of the person's biological sex. Jane agrees with her parent's decision and position. Jane will not use a "gender identity" pronoun, but only a pronoun consistent with the person's biological sex while in school, within school district property, or while attending school or school district events. Jane understands that the Final Rule, as told by her mother, dictates that she abandon her religious beliefs to accommodate "gender identity" pronoun usage, and requires school district officials to ultimately punish her accordingly within the scope of "disciplinary sanctions."

146.    During classroom instructions, without accommodations to opt-out for her religious beliefs, Krug's daughter must endure discussions regarding "gender

40

identity" or require her to either use pronouns inconsistent with the person's biological sex as directed by a school official, such as a teacher. In turn, Krug's daughter is compelled not to speak, a burden on her exercise of religion. Under the Final Rule, as she understands it, expressing her religious views would be discrimination, subject to "disciplinary sanctions," which would negatively affect her classroom grade. High school course grades are important as it relates to entry to college and Krug's daughter has plans to attend college.

147.    Forest Hills Central High does not have gender-neutral bathrooms. Hence, Krug's youngest daughter, still attending Forest Hills, is expected to share a now designated bathroom for girls (females) with persons who identify their gender as a female, but were born as a male. When sharing a bathroom occurs, because of her religious beliefs as embodied within the Krugs' family values, Krug's daughter must endure the psychological trauma inflicted because of the Final Rule. This includes, for instance, discomfort in a limited space, waiting times, or needing to be mindful of another's hygiene routine. While it might also affect others, the school or school district has not offered a viable alternative since the Final Rule has affected opt-out requests for accommodations, how Krug's daughter speaks about the issue or chooses not to speak, and what Krug's daughter's must otherwise endure under the Rule.

148.    Likewise, because of the Final Rule, Jane Krug's younger daughter cannot object to sharing intimate private spaces with a "gender identified" female who

is a biological born male, as such is deemed discriminatory under the Final Rule subject to "disciplinary sanctions."

149.    Finally, Jane Krug has participated in school or school district sponsored or sanctioned events to engage in public debates related to policy decision-making including how local schools or school districts can best address issues directly related to "gender identity." But, the Final Rule has closed those debates for local governmental decision-making and organizational or parental influence on local policy decisions on the "gender identity" issue.

150.    Another example of a GEI member family is the Hilton family. Keara Hilton is the mother of five daughters, ages 13-27, who have all been, or are enrolled in public schools. Currently, they have a 13-year-old daughter and 16-year-old daughter enrolled in the Thornapple Kellogg Schools District (located in northwestern Barry County and Southern Kent County in Michigan), including two girls, one in eighth grade at Thornapple Middle School, and one junior at Thornapple High School. The Thornapple Kellogg Schools District receives Title IX funding.

151.    Like many GEI members, mother Keara Hilton cares deeply about her children's education, and the quality of education in her community, which is why Keara ran for an elected position on the Thornapple Kellog School District School Board. But, with the Department's enactment of the Final Rule, public debates related to policy decision-making including how local schools or school districts can best address issues directly related to "gender identity," the Final Rule has closed those

debates for local governmental decision-making and organizational or parental influence on local policy decisions on the "gender identity" issue.

152.   Like other GEI member families, the Hiltons are sincere Christians and have deeply held religious beliefs that impact every aspect of how they live their lives, as part of their family values. The Hilton family's faith is steadfast in all parts of their life, in their home, at work, at school, and while playing sports.

153.   Part of the Hiltons family's beliefs is one in which all people are created as image bearers of God, both male and female, and that as fellow image-bearers, they must treat others with dignity and respect others no matter who they are or whether they have different beliefs. Part of the Hilton family's beliefs are also that "gender" is immutably tied to an individual's sex, which is assigned by God at conception. Thus, the Hiltons believe that using pronouns to refer to a transgender-identifying individual that are different than that individual's sex would be disrespectful to that individual, lying, and a mockery of God and God's creation as they interpret scripture.

154.   Like other GEI members, another part of the Hilton's deeply held religious beliefs about human sexuality is that marriage is only between one man and one woman, and that abortion is wrong. Like other GEI members, the Hiltons further believe that to not express what they believe to be true is failing to exercise their religion as they interpret scripture. Thus, they will not refer to a person's "gender identity" that is inconsistent with their beliefs.

155.    However, as the Hiltons understand the Final Rule, to refuse to refer to a person's "gender identity" because it is inconsistent with the Hiltons' family values, that is based upon their religious beliefs, they are discriminating against that person or somehow sexually harassing the person. Accordingly, the result of the Final Rule for the Hiltons is an investigation and disciplinary sanctions.

156.    As participants in school or school district sponsored or sanction events, as the Hiltons understand the Final Rule, the government is compelling them to speak in a manner that is contrary to their religious beliefs. In the same vein, the Rule causes them to refrain from speaking when called upon to do so or to challenge another person's "gender identity." If the Hiltons do speak out, then the Hiltons face an investigation or disciplinary sanctions or both.

157.    Like other GEI members, Keara's older daughters went to colleges on athletic scholarships, athletic scholarships that would not have received had but for competing in high school sports. Keara's younger daughters who are still enrolled in public schools are working hard at sports to follow in their sisters' footsteps. For example, Keara's 16-year-old daughter, has received numerous recruitment emails and letters from colleges and universities. Keara's 13-year-old daughter similarly is pursuing athletic possibilities for academic scholarships. The opportunity to participate in sports against fellow females in fair athletic competition, and not against males, is important to Keara's daughters' long-term educational plans. The Hiltons would speak against males who identify as transgender from competing in girls'

sports. But, as the Hiltons understand the Final Rule, doing so can result in being disciplined for sexual harassment or gender-based discrimination.

158.   Like other GEI members, the Hiltons are deeply concerned about their children being forced to share intimate, vulnerable spaces (such as locker rooms and bathrooms) with members of the opposite sex. The Hiltons are dedicated to helping their daughters learn about personal boundaries, to protect themselves, and to demand respect of their own personal space, as well as safety and modesty in private, and vulnerable spaces, such as bathrooms and locker rooms. In part, this is due to their strongly held religious beliefs about bodily integrity and physical modesty, and, in part, this is from Keara's own experience as a survivor of child sexual abuse.

159.   If the Hilton daughters who are still enrolled in public school are forced to share bathrooms or locker rooms with males, the Hiltons would likely have no choice but to pull them from public school and sports because they could not have the same assurance of safety, security, and bodily modesty that their older siblings had prior to the enactment of the Final Rule.

160.   Keara Hilton will exercise her religious convictions and free speech rights to speak about the practice of allowing males in girls' sports and vulnerable spaces as a huge step back for not only their own family but also for women as a whole, and as a sacrificing of women's rights, opportunities, and physical and mental health. Keara Hilton knows that for speaking in this way, she may be disciplined for sexual harassment or discrimination under the Final Rule.

161.    Another example of a GEI member family who is, and will be harmed by the Final Rule is the Levin family, who live in Oakland County, Michigan, and have a son and daughter, attending Walled Lake Northern High School in the Walled Lake Consolidated Schools district. Walled Lake Schools receive Title IX funding.

162.    The mother of the Levin family is Shayna Levin. Like many GEI member parents, Shayna cares deeply about public education in her community, and is currently a school board member for the Walled Lake Consolidated Schools. The Levins have deeply held family values regarding issues related to sex being (with rare biological exceptions) binary, male and female.

163.    As an involved parent and school board member, like many other GEI parents, the Final Rule presents a current barrier to Shayna advocating for, and implementing school policies that accord with local public schools providing a high-quality education that aligns with, or even allows for students to express their own family's values. Part of Shayna's family values include that bathrooms are private spaces, and it is a violation of bodily privacy and integrity to force a child to share a bathroom with individuals of the opposite sex.

164.    Shayna is informed by members of her community, and believes that some children in the Walled Lake School District fear for safety and feel so violated when forced to share a bathroom with individuals of the opposite sex that they decline to drink water and try to "hold it" until they get home, and thus avoid bathrooms entirely. Shayna knows this could lead to serious health consequences.

165.    While Shayna is aware that as a School Board member qualified immunity or legislative immunity might apply to her as an elected official, because she refuses to be compelled by the Final Rule to use pronouns inconsistent with a person's biological sex, she is subject to investigation and disciplinary sanctions for allegations of discrimination or sexual harassment.

166.    Additionally, like most GEI families, the Levin family values single-sex sports, both out of deeply held beliefs about the sexes, and scientific beliefs, and also subsequent concern for safety and fair competition. The Levins are uncomfortable with either their son or daughter being forced to play with, or compete against a member of the opposite sex in a single-sexed sport, such as basketball. Shayna's own experiences reveals how the safety (both physical and otherwise) of her daughter (a basketball player) becomes a forefront concern if males as gender identified females, participate in a single-sex sport. This is just one example of Shayna's understanding of the Final Rule substantially deviates from the 1972 enacted Title IX purpose and definitions of "sex." Moreover, while Shayna and her daughter will speak against males competing in girls' sports, they understand that under the Final Rule, they face threat of accusation of sexual harassment or discrimination under Title IX and will face an investigation leading to disciplinary sanctions

167.    Like other GEI members, the Levin family cares deeply for the safety, privacy, and feelings of all community members, and while they recognize that others may not share their beliefs about sex and gender, "all community members" includes

those that, like the Levins and other GEI members, do not subscribe to the new definition of "sex" to include "gender." And, while Shayna, like other GEI members, would speak on behalf of herself and others regarding her beliefs about sex and "gender," she knows that under the Final Rule, she faces threat of accusation of sexual harassment or discrimination for the purpose of Title IX for doing so, which causes her to hesitate to speak on this issue that impacts the community.

168.    Further, like many other GEI members, despite or in lieu of her position as a School Board member, Shayna is otherwise an involved parent regarding school and school district sponsored or sanctioned events as it relates to her children's education, health, welfare, and well-being.

169.    As a School Board member, Shayna is familiar with the Final Rule and its impact on the School District, her children, and even with regard to her position on the School Board. With her understanding of the Final Rule, there is an obvious conflict between the Final Rule as it pertains to "gender" discrimination and "misgendering" to the extent, as a parent, she cannot express her personal beliefs as to the pronouns she uses to reflect a person's biological sex as a male or female, when encountering individual students, school employees, teachers, or others at school or school district sponsored or sanction events when a person self-identifies with a "gender" that does not correspond with their biological sex.

170.    Shayna believes the Final Rule mandates school and school districts to impose disciplinary sanctions for complaints of discrimination under Title IX. Here,

Shayna believes the Final Rule is viewpoint discrimination because the Rule prohibits Shayna from expressing her personal beliefs as to the pronouns she would otherwise use during school and school district events when interacting with others.

171.   Moreover, notwithstanding her position as a School Board member, as a parent involved in her daughter's educational decisions, school or school district sponsored or sanctioned events, the Final Rule compels Shayna to speak in the manner the federal government mandates, using pronouns that Shayna desires not to use or be subject to disciplinary sanctions.

172.   Finally, Shayna retains her parental right to direct her minor children regarding their own gender identity and how to identify others according to their respective biological sex. Shayna insists her children identify themselves consistent with their born biological sex, and that Title IX, cannot supersede the parental preference or imply "deference to [parental] judgment is appropriate."

173.   In particular, Shayna believes that there is no role for the school or school district to defer to the minor student as to gender identity. "Deference" to the parent of a minor student is paramount (mandatory) and not just "appropriate." Thus, it is for the school or school district to ensure the parent's preference is obeyed.

174.   Here, Shayna believes the Final Rule fails to clarify whether the mandate embodied within the Rule means schools or school districts must adopt a student's gender identity or obey a parental objection.

175.   The Nelsons are another example of a GEI member family. Kindsey Nelson became involved with GEI in-part because the association seeks to improve and secure quality public education in the state of Michigan and to support the values of its member respective families.

176.   The Nelsons have two sons and a daughter, all athletes (ages 12, 14, and 17) who have personal goals to play sports at the collegiate level. Two of the Nelson children are enrolled in public high schools, and one is enrolled in private middle school. One of Kindsey's children is enrolled in the Walled Lake Consolidated School District in Oakland County, Michigan.  One is enrolled in the Hartland Consolidated Schools District in neighboring Livingston County, Michigan. The Nelsons intend that their third child currently enrolled in a private middle school will attend public high school in the Hartland school district.

177.   As the mother of the family Kindsey Nelson's Lutheran faith means that as part of her family values, the Bible guides her and her family's life. Those same religious beliefs affect and guide decisions regarding the quality and content of her children's education. Like the majority of GEI members, Kindsey's deeply held religious beliefs include beliefs that God created humans in his own image to be male and female and that no individual can, nor should they try, to change themselves from the sex God created them to be.

178.   Kindsey believes that all people should be treated with respect and dignity as image-bearers of God, and that it would be a sin against God and bearing

false witness against the individual to affirm someone's self-identification with a "gender identity" that is different from their sex. First, this means that Kindsey has and will continue to use pronouns consistent with a person's biological sex regardless of how that person may identify their gender as something different than their biological sex.

179.    Kindsey believes the Final Rule mandates school and school districts to impose disciplinary sanctions for complaints of discrimination under Title IX. Here, she believes the Final Rule is viewpoint discrimination and a burden on her exercise of religion because the Final Rule prohibits Kindsey and her children from expressing their personal beliefs as to the pronouns she would otherwise use during school and school district events when interacting with others.

180.    Second, because of her religious beliefs, Kindsey believes that she and her children would have to violate the Final Rule if compelled to use pronouns that differ from the male/female binary when referring to a known individual. Kindsey believes her understanding of the Final Rule compels her and her children to use pronouns in a manner that would violate their religious beliefs when they attend or participate in school or school district sponsored or sanctioned events or face disciplinary sanctions.

181.    Kindsey and her children cannot express their personal beliefs as to the pronouns they use to reflect a person's biological sex as a male or female, when encountering individual students, school employees, teachers, or others at school or

school district sponsored or sanction events when a person self-identifies with a "gender" that does not correspond with their biological sex.

182.    Kindsey believes the Final Rule mandates school and school districts to impose disciplinary sanctions for complaints of discrimination under Title IX. Here, Kindsey believes the Final Rule is viewpoint discriminatory because the Rule prohibits her and her children from expressing their personal beliefs as to the pronouns they would otherwise use during school and school district events when interacting with others.

183.    Kindsey, as a parent involved in her children's educational decisions, school or school district sponsored or sanctioned events, the Final Rule compels Kindsey and her children to speak in the manner the federal government mandates, using pronouns that they desire not to use or be subject to disciplinary sanctions.

184.    Finally, at this time, all three of the Nelson children share their parents' Lutheran faith, including their religious beliefs about marriage, the sanctity of life, sex, and "gender identity." In this regard, the Nelson children's religious beliefs are burdened because they are compelled to use pronouns that differ from the male/female binary when referring to a known individual for the purpose of affirming that individual's self-identified transgender "gender identity."

185.    Kindsey retains her parental right to direct her minor children regarding their own gender identity and how to identify others according to their respective biological sex. Regardless, Kindsey insists her children identify themselves consistent

52

with their born biological sex, and that the Final Rule, cannot supersede the parental

preference or imply "deference to [parental] judgment is appropriate."

186.   In particular, Kindsey believes that there is no role for the school or

school district to defer to the minor student as to gender identity. "Deference" to the

parent of a minor student is paramount (mandatory) and not just "appropriate." Thus,

it is for the school or school district to ensure the parent's preference is obeyed.

187.   Here, Kindsey believes the Final Rule fails to clarify whether the

mandate embodied within the Rule means schools or school districts must adopt a

students' gender identity or obey a parental objection.

188.   Kindsey's religious beliefs also include that marriage is only between one

man and one woman. Kindsey's religious beliefs also include that abortion is wrong.

In this sense, Kindsey believes that it would be both a violation of bodily privacy and

morally wrong for a female to be in a space, such as a sex-designated locker room or

sex-designated bathroom, with a male, or vice-versa while in a public educational

institution or school district facility of any kind.

189.   Meanwhile, like many GEI member families, Kindsey Nelson's children

may have individual classmates in their schools who are transgender-identifying;

however, Kindsey has directed her children not to use pronouns that affirm

transgender-identifying "gender identity" of others because of their family values.

190.   Kindsey believes that the Final Rule compels her children, burdening

their exercise of religion, to use pronouns that affirm another individual's

transgender-identifying "gender identity" or face "disciplinary sanctions" as the Rule mandates. Notably, this academic year, after the Final Rule took effect, one of Kindsey's children witnessed a classmate being accused (by school staff) of sexual harassment for "mis-gendering."

191.    Another GEI family, the Osters, reside in rural area in Roscommon County in Northern Michigan. The Osters have three sons enrolled in Houghton Lake Community Schools, both High School and Junior High, which receive Title IX funding. All three sons are student-athletes.

192.    The Osters are Christians, specifically adhering to Baptist theology and beliefs which is part of their family values. As part of their Christian faith, the Osters' sincere religious beliefs guide how they direct the upbringing and education of their children, and they aim to raise their children such that they will adopt their faith as their own throughout their lives.

193.    The Osters believe and direct their children that God created only two sexes, male and female, that "gender" corresponds with the two sexes, that homosexuality is a sin, and that a core purpose of the two sexes and marriage is procreation.

194.    Jennifer Oster and her children, as they have been directed to do so, and in accordance with their religious beliefs, will use pronouns that correspond to the biological sex of the person during school, or during school or school district supported or sponsored events.

195.    The Osters also believe that all people are created in the image of God as either male or female, and should be treated with respect and dignity, which also means they will not lie to or about individuals by using pronouns that do not accord with one's God-given sex.

196.    In a situation that is similar to many GEI families in Michigan, Jennifer Oster and her children are aware that there are transgender-identifying students enrolled in school, and in the school district governing Roscommon County, there is at least one transgender-identifying teacher. While the Osters want to be respectful to the transgender-identifying individuals as fellow image-bearers of God, their deeply held religious beliefs, including their beliefs about truth and biological science, forbid them from sinning by affirming in any way that the use of a transgender-identity is morally right, or otherwise true.

197.    For example, the Osters would only use pronouns that correspond with someone's biology, their God-given sex (sometimes called "sex assigned at birth"). The Osters believe and would say that even while there are inherent and cultural differences between the roles and norms of the sexes, the modern concept of gender is a mere social construction.

198.    As the Osters understand the Final Rule, the federal government is obligating or forcing the Osters to disregard their religious beliefs and identify persons with pronouns that are not consistent with that individual's biological sex when attending school or school district sponsored or sanctioned events. The Osters will

55

not disregard their religious beliefs.   The Final Rule is a burden on their exercise of religion.

199.   The Osters, as they understand the Final Rule, will be subject to disciplinary sanctions because they will not abandon their religious beliefs as part of their family values, when they use pronouns that are consistent with an individual's biological sex and not consistent with that same person's "gender identity."

200.   Aside from being a School Board member, and as an involved parent during school or school district sponsored or sanctioned events, the Final Rule compels Jennifer to use pronouns inconsistent with her family values and religious beliefs or be subject to disciplinary sanctions. Jennifer's alternative is to remain silent, but to do so, prevents her from advocating for her children's well-being within school.

201.   Moreover, as a School Board member, the Final Rule makes no accommodation for elected officials in the context of immunity from disciplinary sanctions. As Jennifer understands it, generally, as a School Board member, she has at least qualified immunity or legislative immunity. However, under the Final Rule, because she will not use pronouns consistent with another person's "gender identity" during any school or school district sponsored or sanctioned event because of her family values, inclusive of her religious beliefs, Jennifer remains subject to disciplinary sanctions. The Final Rule compels her to use pronouns inconsistent with her religious beliefs as previously described.

202.   Like many GEI member parents or guardians, Jennifer Oster is also a member of other education and family-oriented parental rights organizations, including Moms for Liberty.

203.   Despite Jennifer's knowledge of granted preliminary injunctions affecting the implementation of the Final Rule in other states, because those injunctions are not applicable to Michigan, Michigan school districts or schools, having and continuing to receive federal funding, are obligated to implement the Final Rule. Inclusive of the implementation are disciplinary sanctions. However, the Final Rule is in direct conflict with Jennifer's and her children's family values, including their religious beliefs, and further compels them to use pronouns contrary to those values. Because Jennifer and her children will not use pronouns to accommodate another person's "gender identity," under the Final Rule, they are and will be legally discriminating against others and the Rule mandates investigative processes and disciplinary sanctions accordingly.

204.   Similar to other GEI member families, the Osters are also deeply concerned about their children, that because of the Final Rule, they would be forced to share intimate, vulnerable spaces (such as locker rooms and bathrooms) with members of the opposite sex. In part, this is due to their strongly held religious beliefs about bodily integrity and physical modesty. The Oster's oldest son plays football, basketball, and participates in weightlifting class. Their middle son plays football, has been on the wrestling team, plays baseball, and participates in weightlifting class. The

youngest Oster son also participates in weightlifting, football, basketball, and track and field. Jennifer has imparted the religious and safety values of privacy and modesty to all three of her sons, but all three sons would feel deeply uncomfortable and violated if a member of the opposite sex was in their locker room while in a state of undressed vulnerability.

205.    Furthermore, as a School Board member, public debates related to policy decision-making how her local school district can best address issues directly related to "gender identity." But, the Final Rule has closed those debates for local governmental decision-making and organizational or parental influence on local policy decisions.

206.    Another example of GEI members is Alex and Angela Yarber. Angela, her husband Alex, and their children are practicing Catholics. Their religious beliefs are part of their family values.

207.    Like some GEI members, Angela herself is a public school teacher.

208.    While Alex and Angela's two older sons are graduated from high school, they have a daughter who is currently a student at Hartland High School in the Hartland Consolidated Schools District, which receives Title IX funding.

209.    Similar to the experience of many GEI members in their communities, Alex and Angela participate in school and school district sponsored or sanctioned events. This includes, for example, forums that involve an ongoing public discourse in the Hartland Consolidated Schools District about safety and religious free exercise

violations related to transgender-identifying individuals using bathrooms and locker rooms that do not correspond with the individual's sex. However, to their knowledge and belief, the Final Rule has proverbially "put the thumb on the scale" of the public debate and discourse by tying up federal funds with the implementation of the Final Rule. This is due in part to approximately 1/8 of the Hartland Consolidated Schools District funds are tied to Title IX compliance. Additionally, the Final Rule also mandates investigations and disciplinary sanctions those who refuse to follow the Final Rule's mandates as it relates to "gender identity."

210. Similar to many GEI members, Alex, Angela and their sons and daughter are very religious as they actively practice their Catholic Faith in their daily lives. Consistent with their personal religious interpretations of the Bible that guide them daily, their parish priest encourages people to stand up for what they believe is true. This includes for instance, that all people are to be treated with dignity and respect as fellow image bearers of God, and that "gender" is immutably tied to an individual's sex, which is assigned by God at conception. Thus, the Yarbers believe that using pronouns to refer to a transgender-identifying individual that are different than that individual's sex would be lying, and a sin against God and all hearers of the false reference.

211. Another part of the Yarber's deeply held religious beliefs about human sexuality is that marriage is only between one man and one woman, and that abortion is wrong. Like other GEI members, the Yarbers further believe that to not express

what they believe to be true is failing to exercise their religious beliefs. In this regard, they will not use pronouns that are inconsistent with a person's sex as a self-identifying gender, and have instructed their children to do the same. In this regard, as the Yarbers understand the Final Rule, their behavior is subject to investigation and disciplinary sanctions as either discriminatory acts or "sexual harassment."

212.    The Final Rule compels the Yarbers to use pronouns when speaking or refrain from speaking during school or school district supported or sanctioned events despite and in disregard for their religious beliefs.

213.    As the Yarbers understand the Final Rule, it makes no accommodation for religious beliefs.  In fact, it is a burden on their exercise of religion.

214.    Similar to other GEI members, part of Alex and Angela's family religious beliefs includes bodily integrity and modesty, which they believe is violated when individuals of the opposite sex use their bathrooms or locker rooms where people are in states of vulnerable undress. Part of that religious belief is that neighbors should do and say what they can to keep others safe, especially children.

215.    Like most Michigan schools where GEI families have children enrolled, the bathroom stalls only mostly obfuscate the view of the stall interior. There are often cracks on either side of the bathroom doors. Like other GEI members, the Yarbers know that speech is already being chilled in part due to their understanding of the Final Rule having already been implemented officially or unofficially by the school or school district.

216.    For example, Angela learned from, and believes from a community member's daughter that recently, a male student did enter a school's girls bathroom while a girl was in a vulnerable state of partial undress. The male student did peep at her through the cracks in the stall. However, the community member's daughter was afraid that if she spoke and publicly revealed the male student's identity, and her fear and discomfort, it would be discriminatory or deemed as sexual harassment under the Final Rule.

217.    As a former school board candidate, teacher, and community member, and like many GEI parents, Angela is also aware that many children—at schools that allow members of the opposite sex into bathrooms—try to avoid using school bathrooms entirely, but rather try to "hold it" out of fear of encountering a member of the opposite sex while vulnerable. Angela is aware that multiple people in the community, both students and parents are afraid that if they report or speak about their discomfort, safety concerns, and their religious beliefs about sex-exclusive spaces and bodily integrity, privacy, and modesty around the opposite sex, they will be accused, investigated, and subject to disciplinary sanctions under the Final Rule, and suffer greater reputational damage as a result, in addition to sanctions related to any other school policy.

218.    Like many GEI member parents, Angela has previously publicly spoken about her beliefs about truth, privacy, and safety, which are informed by her religious convictions. And, like many children of GEI families, Alex and Angela's daughter

spoke about her concerns for safety in bathrooms and locker rooms during a public school board meeting during the 2023-2024 school year. Their daughter faced mockery and harassment from at least one teacher and classmates for speaking at that school board meeting. Their daughter, to maintain as much bodily privacy as possible in accordance with her religious beliefs and her safety concerns has already been changing in the slightly-more-private bathroom stalls rather than in an open locker room.

219.   However, as they understand the Final Rule, because Alex's and Angela's daughter will not use pronouns consistent with a person's "gender identity," and based upon her past experience in the absence of the Final Rule, their daughter cannot speak her truth and exercise her religious beliefs without not only being mocked and harassed by teachers and students, she will be accused of discrimination or sexual harassment or bother under the Final Rule and face investigation and disciplinary sanctions. To avoid any of this, the Final Rule compels their daughter (and Alex and Angela while participating in school or school district sponsored or sanctioned events) to use pronouns or actions (for example, the use of bath or locker rooms) consistent with the Final Rule mandates.

220.   Like those GEI members who are also teachers, they will be either compelled to use pronouns or refrain from speaking what she believes is true about human sexuality and "gender identity," or pronouns during class instruction or while attending other school or school district supported or sponsored events, because of

their respective family values, inclusive of religious beliefs, or subject themselves to investigation and disciplinary sanctions because of the obligations or mandates found under the Final Rule.

221.    The Final Rule has caused damage to GEI, increasing its expenses and reducing its return-on-investment for parents, board members, employees, volunteers and donor.

222.    GEI is a non-profit organization based in Michigan dedicated to advocating for children's premium public education.

223.    GEI's beliefs are that all children should have access to a high quality public school education with the resources they need to succeed while aligning with their own families' values.

224.    GEI and its supporters are committed to amplifying the voices of parents, students, and public school initiatives.

225.    GEI's mission is to promote a culture of excellence in public education by advocating for the rights of parents, the safety and security of students, and the right to an orthodox education. GEI is committed to fighting for the future of our youth and the advancement of our public school system.

226.    All of GEI's founders and board members are religiously-motivated in their work with GEI and see GEI as a form of public ministry.

227.   GEI, since the 2022-2023 school year, has engaged in a statewide parental opt-out program to amplify and advocate for the rights of parents and students to Opt-Out of the school's objectionable activities.

228.   GEI resources have been used to create the GEI Opt-Out form (Exhibit 1), a website highlighting the GEI Opt-Out form (greatei.org), and a statewide network to distribute, collect and enforce the GEI Opt-Out form.

229.   GEI board members were religiously motivated in developing the GEI Opt-Out form, and while the Opt-Out form itself does not mention any one religious tradition or set of beliefs, nearly all the parents GEI has talked to regarding the GEI Opt-Out form are religiously motivated to seek opt-out accommodations the GEI form seeks to facilitate.

230.   GEI is aware that parents share the electronic version of the GEI Opt-out forms with other parents, and that some groups of parents additionally print out and distribute photocopies of the GEI Opt-Out form. GEI has no way of knowing precisely how many GEI opt-out forms are submitted to local schools.

231.   GEI has updated our Opt-Out form each year since 2022.

232.   GEI keeps a record of the number of GEI Opt-Out forms that are downloaded from the GEI (formerly known as GSI, for "Great Schools Initiative")

website each month.



233.    At the beginning of the 2022-2023 school year, approximately 150 GEI Opt-Out forms were downloaded from the GEI website.

234.    At the beginning of 2023-2024 school year, approximately 60 GEI Opt-Out forms were downloaded from the GEI website.

235.    At the beginning of the 2024-2025 school year, approximately 20 GEI Opt-Out Forms have been downloaded from the GEI website.

236.    GEI believes the Department's Final Rule caused a decline in Opt-Out form downloads for the 2024-2025 school year when compared to earlier school years and that decline is reflected in the chart above.

237.    GEI's Opt-Out forms allowed parents to opt of the school's objectionable activities.  In a majority of the Opt-Out forms, the parents' motivations were religious.  The parents wanted to Opt-Out of classroom instruction which suggested their religious views were discrimination based on sex stereotypes, sex characteristics, sexual orientation or gender identity.

238.    GEI's Opt-Out program was thwarted in 2024 by the Department of Education recently issuing a new rule implementing Title IX of the Education Amendments of 1972 in a way that had never been done before. The 2024 version of the Final Rule newly defined sex discrimination to "includ[e] discrimination on the basis of sex stereotypes, sex characteristics…sexual orientation, and gender identity." 89 Fed. Reg. 33886 (2024).

239.    The Final Rule labels many of GEI parents' religious views as "discrimination based on sex stereotypes, sex characteristics, pregnancy, sexual orientation or gender identity."

240.    The Final Rule deters parents from filing the GEI Opt-Out form because parents fear that the GEI Opt-Out form itself will be used as evidence of "discrimination based on sex stereotypes, sex characteristics, pregnancy, sexual orientation or gender identity."

241.    Since the Final Rule was adopted, parents have been unwilling to sign and submit GEI Opt-Out forms to their schools for fear of the GEI Opt-Out form being used as evidence to support Title IX claim based on "discrimination based on

sex stereotypes, sex characteristics, pregnancy, sexual orientation or gender identity under the federal regulation."

242.    The Final Rule deters GEI's religiously motivated parents to sign and submit GEI's Opt-Out forms for the following reasons.

243.    First, with regard to sex-based harassment, the Final Rule defines "sex-based harassment" as a form of sex discrimination that includes sexual harassment and harassment based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, or gender identity, that is quid pro quo harassment, hostile environment harassment, or one of four specific offenses referenced in the Jeanne Clery Disclosure of Campus Security Policy and Campus Crimes Statistics Act ("Clery Act") as amended by the Violence Against Women Reauthorization Act of 2013. The Final Rule's definition of "sex-based harassment" deters GEI's religiously-motivated parents from filing the GEI Opt-Out form because parents fear that the GEI Opt-Out form itself will be used as evidence of "discrimination based on sex stereotypes, sex characteristics, pregnancy, sexual orientation or gender identity.

244.    Second, with respect to sex-based harassment, the Final Rule provides and clarifies definitions of various terms related to a school district's obligations to address sex discrimination, including sex-based harassment. The Final Rule's provision and clarification to school districts to address sex-based harassment deters GEI's religiously-motivated parents from filing the GEI Opt-Out form because parents fear that the GEI Opt-Out form itself will be used as evidence of

"discrimination based on sex stereotypes, sex characteristics, pregnancy, sexual orientation or gender identity."

245.    Third, with respect to sex-based harassment, the Final Rule clarifies a school district's required response to sex discrimination, including sex-based harassment, in its education program or activity.  The federal regulation's requirement threat of a required response by the school district to "sex-based harassment" deters GEI's religiously-motivated parents from filing the GEI Opt-Out form because parents fear that the GEI Opt-Out form itself will be used as evidence of "sex-based harassment"

246.    Fourth, with respect to sex-based harassment, the Final Rule strengthens a school district's obligations to provide prompt and equitable grievance procedures and to take other necessary steps when it receives a complaint of sex discrimination, including sex-based harassment complaint. The Final Rule's threat of a school district prompt and equitable grievance procedures upon a claim of "sex-based harassment" deters parents from filing the GEI Opt-Out form because GEI's religiously-motivated parents fear that the GEI Opt-Out form itself will be used as evidence of "sex-based harassment."

247.    The Final Rule's legal requirements on the school district has prevented GEI's religiously-motivated parents from signing the GEI's Opt-Out form.

248.    GEI has been hearing from parents that seek opt-out accommodations due to religious concerns that those parents are already apprehensive to attempt to file

an opt-out form for fear of retaliation against themselves, or their children. Now, parents are more apprehensive to attempt to file an opt-out form out of fear that they will bring attention to themselves for accusation of sexual environment harassment and parents are declining to attempt to file an opt-out form for that reason.

249.   In addition, GEI is receiving word from parents who did sign a GEI opt-out form that for school districts that are attempting to adopt the Final Rule that the school districts do not believe they can honor an opt-out accommodation request from a GEI member because of the new federal regulation.

250.   The Final Rule damages GEI's business is because GEI's Opt-Out program is obliterated by the federal regulations deterring GEI's religiously-motivated parents from signing and submitting GEI's Opt-Out form. Without these parents signing GEI's Opt-Out form, GEI's Opt-Out program is in ruins because no GEI Opt-Out forms are signed and submitted to schools.

251.   The federal regulation has caused GEI's resource investment in the GEI Opt-Out program to be non-productive, worthless.

252.   GEI now expend more resources, diverting resources from other projects, to obtain sub-optimal results from its GEI Opt-Out program because of the Department's Final Rule—an unnecessary waste of resources.

253.   GEI's return-on-investment for board members, supporters, parents, donor, employees and volunteers is reduced by the Department's Final Rule because the GEI Opt-Out program is not working optimally anymore.

254.    A court injunction against the Final Rule will redress GEI's injury because the parents would not be fearful of signing GEI's Opt-Out form anymore. And, in turn, the GEI Opt-Out program's prior success and prior return-on-investment would be revived.

## CLAIMS

### Count I:   The Final Rule is Contrary the Religious Freedom Restoration Act (42 U.S.C. § 2000bb-1)

255.    All previous paragraphs are incorporated as if fully restated to support the claim asserted.

256.    GEI brings its own private cause of action under the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb-1(c) which is accurately quoted, in part, as follows: "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."

257.    The Plaintiff GEI believes the Final Rule is contrary to law because it is not provide RFRA-required religious accommodations.

258.    Schools that receive federal funding under Title IX are subject to RFRA.

259.    As accurately quoted in part, RFRA provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. 2000bb-1(a). "If the Government substantially burdens a person's exercise of religion, under the Act that person is

entitled to an exemption from the rule unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694–95 (2014). RFRA applies to any "department or agency" of the United States, including the Department. 42 U.S.C. 2000bb–2(1).

260.   GEI believes that by requiring GEI member family parents and children attending public schools in Michigan, or other school or school district supported or sponsored events, like the Krugs, Hiltons, Nelsons, Osters, Yarbers, and others to speak or use pronouns in a manner that violates their religious beliefs or restricts their religiously motivated speech about gender identity, the Final Rule violates RFRA.

261.   GEI also believes the Department has no compelling interest in requiring or restricting speech, and the Department's construction of "sex-based" harassment is not the least restrictive means of furthering that interest.

262.   Moreover, GEI believes that the Final Rule fails to provide for religious accommodations for GEI families such as the Krugs, Hiltons, Nelsons, Osters, Yarbers, and others.

263.   By requiring GEI member families with religious beliefs about bodily integrity and modesty between the sexes to stay silent about their beliefs, and to share intimate, vulnerable spaces with members of the opposite sex who self-identify as the

71

same "gender," GEI member families are injured, harmed and burdened by the Department's Final Rule RFRA violation because it limits their religious free exercise.

264.   One of GEI's core activities and mission is to advocate for quality public education that aligns with a student's own family values. The vast majority of GEI member families have family values that are deeply rooted in their religious beliefs, including religious beliefs about human sexuality.

265.   GEI's opt-out project is specifically designed to help GEI members secure religious accommodations regarding instruction on human sexuality issues, including "gender identity."

266.   However, because Michigan schools where GEI member families have children enrolled believe they cannot make accommodations due to the Final Rule, the Final Rule interferes with one of GEI's core activities regarding opt-out communications with schools and school districts that seek accommodations for religious free exercise purposes. With the Final Rule, the GEI opt-out form will not be entertained by any school or school district because it seeks, a waiver to all mandates or obligations under the Final Rule for GEI parent and guardian children relating to "gender identity." Therefore, GEI itself is injured, harmed and damaged by the Final Rule's violation of RFRA because the Final Rule offers no religious accommodations as RFRA requires.

267.    As detailed above, the Final Rule has caused damage to GEI, increasing its expenses and reducing its return-on-investment for parents, board members, employees, volunteers and donors.

268.    The GEI believes the Final Rule is contrary to Title IX and RFRA and therefore, is unlawful facially and as-applied to GEI and its parent-members. This Court should declare the Final Rule as a RFRA violation and provide appropriate relief.  This Court should award appropriate relief under RFRA including declaratory relief, injunctive relief and damages.

## Count II:  The Final Rule is Contrary to the Text of Title IX (5 U.S.C. § 706)

269.    All previous paragraphs are incorporated as if fully restated to support the claim asserted.

270.    GEI brings this claim under the Administrative Procedures Act, 5 U.S.C. § 701, et seq.

271.    GEI believes the Final Rule is contrary to law and exceeds the Department's statutory rule-making authority because it violates the plain language of Title IX.

272.    GEI believes that, at the time of Title IX's enactment in 1972, Title IX defined sex on the basis of biology and reproductive functions. GEI also believes that to include "gender identity" in the definition of sex ignores the overall statutory scheme of Title IX, rendering the many sex-based exceptions meaningless and

provide more protection against discrimination on the basis of transgender status

under the Final Rule than it would against discrimination on the basis of sex.

273.    In short, GEI believes that defining "sex" to include "gender identity"

does not comport to the plain meaning of "sex" at the time of the 1972 enactment of

Title IX.

274.    GEI believes the Final Rule is contrary to law because Title IX nowhere

refers to "gender identity," the Title IX term "sex" does not include "gender identity,"

and Title IX's prohibition of discrimination "on the basis of sex" does not encompass

discrimination based on "gender identity."

275.    GEI believes the Final Rule is contrary to law because Title IX and

longstanding Department regulations explicitly permit distinctions based on biological

sex in certain circumstances.

276.    GEI believes the Final Rule is contrary to law because the purpose of

Title IX was to protect equal opportunities for women and girls in education, which

in 1972 would have been understood to refer to biological women and girls, not a

biological male who "identified" as a woman.

277.    GEI believes the Final Rule is contrary to law because the purpose of

Title IX when enacted was to protect equal opportunities for women and girls in

education. The Final Rule deprives some GEI member families, for example, the

Hiltons and their daughters, the Krugs and their younger daughter, the Levins and

their daughter, the Nelsons and their daughter, as well other students of the equal

opportunity to enjoy educational benefits and facilities such as access to sex-specific facilities like restrooms and locker rooms.

278.   GEI believes the Final Rule is contrary to law because the purpose of Title IX was to protect equal opportunities for women and girls in athletics and the Final Rule renders protections for women and girls in athletics as meaningless.

279.   Part of the U.S. Code regarding education in 20 U.S.C. § 1688 states, as accurately quoted in part: "Nothing in this section shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit, including use of facilities, related to an abortion" (emphasis added). GEI believes the Final Rule is contrary to this section because it requires educational institutions to provide leave and other employment or educational benefits in connection with any condition related to pregnancy, which the Final Rule defines to include termination of pregnancy (that is, abortion).

280.   GEI believes Title IX does not have grant extraterritorial jurisdiction. It does not authorize Department to withhold federal funding from a school just because someone associated with the school did not accommodate any person's "gender identity" anywhere in the world.

281.   GEI believes the Final Rule is also contrary to law because it violates the requirement for "neutrality with respect to abortion" in 20 U.S.C. § 1688.

282.    The Plaintiff GEI believes the Final Rule is contrary to Title IX itself and therefore, this Court should declare the Final Rule as unlawful and enjoin the enforcement of the Final Rule accordingly.

### Count III: Agency Action in Excess of Statutory Jurisdiction and in Violation of Separation of Powers U.S. Const. art. I, § 1

283.    All of the above paragraphs are realleged as if fully restated to support this claim.

284.    The Administrative Procedures Act (APA) requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

285.    GEI believes the Final Rule is final agency action subject to judicial review under the APA. *Id.* § 704.

286.    GEI believes the Final Rule is a "rule[]" under the APA. *Id.* § 701(b)(2).

287.    GEI believes the Department and is an "agency" under the APA. *Id.* § 701(b)(1).

288.    GEI believes the it is a "person" under the APA. *Id.* § 702. Further, all of GEI's individual members are "person[s]" under the APA.

289.    GEI believes that under the constitutional separation of powers, each branch of government has been vested with different powers. "All legislative Powers" granted by the Constitution "shall be vested in . . . Congress." U.S. Const. art. I, § 1. The Constitution does not vest executive agencies with legislative powers.

290.    GEI believes the separation of powers principles prohibit an agency from deciding an issue of great economic or political significance, or issues traditionally governed by state or local law, absent clear authorization from Congress to do so. Congress has not given new or direct authorization, and the Department has departed from its longstanding past practice. GEI believes this means the Department is acting without Congressional authorization.

291.    GEI believes the Final Rule invokes the major questions doctrine because questions regarding the relationship between "gender identity," biological sex, and First Amendment freedoms are issues of vast political significance, subject to debate all across the country.

292.    GEI believes that parents, teachers, and school boards can all reasonably disagree about how to accommodate students' "gender identities" and how to balance the privacy and dignity needs of all their students, within the confines of state law and the Constitution. GEI believes the Final Rule removes all of that discretion and has the effect of compelling federal government speech upon local governmental entities to coerce viewpoints contrary to and upon parents and their children family values,

including their religious beliefs, without the ability to obtain accommodations for their beliefs.

293.    GEI believes the Final Rule also greatly departs from Department's fifty-year-long interpretation of "sex."

294.    GEI believes the role that biological sex plays in educational programs and activities (including women's and girls' sports)—and, indeed, the relative importance of "gender identity" as opposed to sex in many areas of daily life including but not limited to use of bathrooms and locker rooms—is likewise an issue of political significance that is subject to extensive debate across the country.

295.    GEI believes the Department must therefore show Congress plainly authorized the Final Rule, but the Department cannot make that showing.

296.    GEI believes nothing in the Title IX Amendments to the Civil Rights Act clearly authorizes Department to resolve this debate by unilaterally deciding "harassment on the basis of sex" now includes "gender identity."

297.    GEI believes nothing in Title IX gives Department clear authorization to replace or include "sex" with "gender identity."

298.    GEI believes the Final Rule harms GEI member family students, for example, the Krugs, Hiltons, Levins, Osters, Nelsons, and Yarbers, and other students by opening up women's locker rooms and restrooms to biological males and men's restrooms and locker rooms to biological females. It requires schools to place

students in rooms consistent with their "gender identity," rather than biological sex, during overnight stays or trips.

299.   GEI believes Title IX does not clearly authorize Department to change the conditions on which parents or guardians and their children, including States, have relied upon prior to the Final Rule, namely, that biological males and biological females should be treated equally.

300.   GEI believes that Congress has chosen not to rewrite Title IX's definition of "sex" as the Department attempts to do with the Final Rule. Members of Congress have introduced legislation that would accomplish this, *see, e.g.*, H.Res. 269 (2023), but Congress has chosen not to act. GEI believes the that by acting unilaterally, Defendants have "seiz[ed]he power of the Legislature." *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023).

301.   GEI believes the that the Department therefore has no clear authorization to replace the word "sex" with concepts of "gender identity," nor can it reinterpret Title IX in such a broad, unreasonable way. Hence, the Department exceeded its authority when it issued the Final Rule.

302.   GEI believes that, in addition to making these changes, the Final Rule makes major changes to sexual assault investigations and changes to how educational institutions must accommodate students and employees regarding their abortions.

303.   GEI believes all of these issues are the subject of debate, are politically important, and are subjects Congress, (and/or local communities) should debate and

decide. Nothing in Title IX clearly authorizes Department to end that debate and decide it for themselves. The Final Rule, taken as a whole, implicates and violates the major questions doctrine and should be set aside.

304.    GEI believes that the Defendants are not entitled to deference regarding their interpretation of law, even if the definition of "sex" in Title IX were ambiguous, though the definition of "sex" is not and was not ambiguous. *See Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244, 2247 (2024).

305.    GEI believes that the Final Rule also implicates the major questions doctrine because Department seeks to intrude into education which is a domain of the state, which in-turn in Michigan leaves decisions to intermediate school districts and local school districts.

306.    GEI believes that education has always been a particular domain of state law and local policy, and Department's power in that domain has traditionally been limited. This Final Rule seeks to intrude upon "vast swaths of American life" through trying to remake the American education system. Furthermore, the Final Rule would pre-empt multiple laws and local school district policy throughout Michigan, presenting a present barrier to GEI in its core organizational mission.

307.    GEI believes that nothing in Title IX gave the Defendants clear authorization to intrude upon this domain of state law and local policy through fundamentally remaking the education system and pre-empting state laws and local policy along the way.

308.    GEI believes that even if the Final Rule does not implicate the major

questions doctrine, it still violates the separation of powers principle. GEI further

believes that the Department's new interpretation of Title IX is so far from any

reasonable interpretation of the statute that the Final Rule amounts to an

unconstitutional act of legislative power. *See* U.S. Const. art. I, § 1.

309.    Because of the present barrier the Final Rule is to GEI's core

organizational purposes, including its purpose to advocate for and to local school

district, as well as intermediate school district policies, and state and federal law,

Plaintiff GEI is harmed by the Department's violation of the separation of powers, or

major questions doctrine, or both.

310.    The Plaintiff GEI believes the Final Rule violates the major question

doctrine and the separation of powers principle as the Department has exceeded its

authority to enact the Final Rule, and therefore, this Court should declare the Final

Rule as unlawful and enjoin the enforcement of the Final Rule accordingly.

### Count IV:   The Department's Final Rule Violates First Amendment Religious Rights (5 U.S.C. § 706, U.S. Const. art. I, § 8, U.S. Const. amend. I)

311.    All of the above paragraphs are realleged as if fully restated to support

this claim.

312.    GEI believes the Department's interpretation of Title IX in the Final

Rule is "not in accordance with law," "contrary to constitutional right, power,

privilege, or immunity," and "in excess of statutory jurisdiction, authority, or

limitations," 5 U.S.C. § 706(2)(A)-(C), because it violates the First Amendment to the U.S. Constitution and conditions the receipt of federal funds on recipients (schools) violating the First Amendment rights of others, including Plaintiff GEI and its member families.

313.    GEI believes the Defendants are not entitled to deference regarding their interpretation of law, even if the definition of "sex" in title IX were ambiguous, and it is not. *See Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244, 2247 (2024).

314.    GEI believes that Defendants' interpretation of Title IX in the Final Rule conflicts with the First Amendment's protection of religious liberty.

315.    GEI believes the Final Rule would require individual students, teachers, coaches, and school administrators, and parents attending school sessions, events, or activities to acknowledge, affirm, and validate students' "gender identities" regardless of the speakers' own religious beliefs on the matter in violation of the First Amendment. The Final Rule requires Michigan schools and school districts, including schools and school districts where GEI member families have children enrolled, to enforce the Final Rule.

316.    GEI believes the Final Rule compels some GEI members, for example the Krugs, Hiltons, Levins, Osters, Nelsons, and Yarbers, their children, to speak for the government's directives, obligations, or mandates regarding "gender identity" forcing them to forego their religious beliefs, hence their religious liberties and freedom of expression under the First Amendment.

317.    GEI believes the Final Rule also precludes some GEI members, for example the Krugs, Hiltons, Levins, Osters, Nelsons, and Yarbers, and their children from expressing their beliefs about gender identity in violation of their religious liberty and freedom of expression under the First Amendment. The Final Rule also chills and deters the protected expression of some GEI members who will stop expressing their views at school or school district sponsored or sanctioned events in violation of their religious liberty and freedom of expression under the First Amendment.

318.    GEI believes the Final Rule is unlawful and should be set aside because it violates the First Amendment and imposes unconstitutional conditions on the receipt of federal funds.

319.    The Plaintiff GEI believes the Final Rule violates the religious liberties granted and preserved under the First Amendment and therefore, this Court should declare the Final Rule as unlawful and enjoin the enforcement of the Final Rule accordingly.

**Count V:   Violation of First Amendment Free Speech: Compelled Speech**

320.    All of the above paragraphs are realleged as if fully restated to support this claim.

321.    GEI believes the U.S. Supreme Court has long recognized that the first amendment protects freedom of thought and expression, which includes the right to speak freely, and the right to refrain from speaking.

322.    To this end, GEI believes that part of freedom of speech is freedom from compelled speech. GEI believes it is fundamentally a violation of First Amendment free speech when an official forces people to confess something they do not believe, and an even more egregious, demeaning violation when free and independent individuals are forced to endorse ideas they find objectionable.

323.    GEI believes the Final Rule compels the children of members of GEI (for example, the Krugs, Hiltons, Levins, Osters, Nelsons, and Yarbers) to, at the risk of investigation and discipline upon refusal, affirm a transgender student's selected sex by using preferred pronouns even though the GEI member or GEI member family child has a deeply held belief that sex is determined by their family values, including their religious beliefs, and objects to the idea of "gender identity."

324.    GEI knows that other courts have held, at least initially (by the grant of preliminary injunctions), that requiring individuals to use preferred pronouns violates the protection against compelled speech protected under the First Amendment.

325.    GEI believes it is irrelevant that the Final Rule might not literally force any student (or parent, teacher, or school board member, or others) to engage in speech. Yet, using pronouns for a person's "gender identity" is a "'virtual necessity'" for engaging in any conversation, especially since Plaintiff GEI has members who have engaged in discussions about "gender identity" and will do so in the future.

326.    GEI believes the Final Rule prohibits GEI member parents, students, and others from speaking their belief that sex and "gender identity" are linked, or that

"gender identity" is a mere social construct, or that God created human individuals as either male and female from conception and that cannot be changed. Additionally, GEI member parents, students, and others who might try to not use any pronouns would still be speaking, or refraining from speaking in violation of their real beliefs and ideas. GEI believes the Final Rule cannot force students, parents, and others from choosing between silence and being forced to parrot a government message. *See* 89 Fed. Reg. 33516 (discussing comments citing *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021))

327. GEI believes the Final Rule would also require GEI members parents, and GEI member family students to make statements that they believe to be false and affirm governmental ideologies that violate their deeply-held beliefs.

328. In announcing the Final Rule, Assistant Secretary for Civil Rights in the Department affirmatively stated the Office for Civil Rights' view that instances "Deadnaming" or "misgendering" with respect to gender identity would give rise to hostile environment discrimination.

329. GEI believes the Final Rule cannot compel affirmance of the Department's governmental preferred viewpoint (e.g., that a human can change genders, hold multiple genders, or no gender at all) and ban the opposing viewpoint (e.g., that sex is immutable, and assigned by God).

330. GEI believes that the Final Rule violates the First Amendment's protection against compelled speech and therefore, is invalid and should be enjoined.

331.    GEI also believes that the First and Fourteenth Amendments prohibit restrictions that are unconstitutionally vague. Unconstitutionally vague laws or regulations are problematic because there is not fair notice of what is outlawed, and officials who are supposed to enforce those laws or regulations do not have clear standards.

332.    GEI believes a restriction is unconstitutionally vague if it "either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925)).

333.    GEI believes that vague policies, laws, or regulations raise due process concerns because they force individuals to guess at their meaning, and that as a result of this vagueness, individuals may have their speech "chilled" while trying to stay clear of violations.

334.    GEI believes that when policies prohibit constitutionally protected conduct or speech, thereby chilling speech, that means the policy on its face is unconstitutionally overbroad.

335.    GEI believes vague and overbroad policies are also unconstitutional because they give officials unfettered discretion to approve or censor speech based on its viewpoint or content.

336.   GEI believes if a restriction interferes with the right of free speech, then a stringent test for vagueness applies.

337.   GEI believes the Final Rule lacks any precise definitions, detail, context, or notice to GEI members, including students or parents, and others, about what constitutes sexual harassment, sex, gender identity, or what sorts of statements are can create sex-based discrimination or hostile environment harassment. This provision fails to deliver adequate notice, guarantees arbitrary enforcement and is therefore unconstitutional.

338.   For this reason, GEI has members who fear penalties for engaging in discussions regarding "gender identity" that that they have had and would continue to have, but-for the Final Rule.

339.   GEI believes enforcing the Final Rule would, therefore, violate the First and Fourteenth Amendment's protections against vagueness and overbreadth.

340.   GEI asl believes the Final Rule's revised definition of harassment is a classic restriction that regulates based on content and viewpoint.

341.   GEI believes chilled speech is a recognized First Amendment injury.

342.   GEI has members who have spoken critically on gender identity, and wish to speak, or host speakers who are critical on the topic of "gender identity" in the future.

343. GEI has members refrain from speech because they are concerned about a credible threat of enforcement of the Final Rule against them and their school.

344. GEI believes that because the Final Rule discriminates based on viewpoint, it is presumptively unconstitutional.

345. GEI believes regardless, under any balancing test, the Final Rule violates the First Amendment. Defendants cannot show that they have a compelling interest to justify restricting speech. Even if they did, Defendants cannot show that any such interest is narrowly tailored.

346. GEI believes the Department enforcing the Final Rule would, therefore, violate the First Amendment and therefore, is invalid and should be enjoined.

### Requested Relief

WHEREFORE, Plaintiff GEI respectfully request the following relief:

(1) Award appropriate relief under the Religious Freedom Restoration Act, including damages, declaratory and injunctive relief and attorney's fees.

(2) A declaratory judgment holding the Final Rule unlawful;

(3) A declaratory judgment holding that Michigan schools or school districts or both, where GEI member families have children enrolled are not bound by the Final Rule;

(4) A declaratory judgment affirming that Michigan schools or school districts or both, where GEI member families have children enrolled may continue to separate

students by biological sex in appropriate circumstances in accordance with Title IX's statutory text prior to the enactment of the Final Rule and longstanding Department regulations;

(5) A declaratory judgment that Title IX does not prohibit Michigan schools or school districts or both where GEI member families have children enrolled from maintaining showers, locker rooms, restrooms, residential facilities, and other living facilities separated by biological sex or from regulating each individual's access to those facilities based on such individual's biological sex;

(6) A declaratory judgment that Title IX does not require a Title IX recipient's employees or students to use an individual's preferred pronouns or honorifics;

(7) A declaratory judgment that Title IX does not prohibit Michigan schools or school districts or both where GEI member families have children enrolled from maintaining athletic teams separated by biological sex or from assigning an individual to a team based on such individual's biological sex;

(8) A declaratory judgment holding that the Department lacked authority to issue the Final Rule;

(9) A judgment setting aside the Final Rule;

(10) A preliminary and permanent injunction prohibiting Defendants and their officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with those individuals from enforcing the Final Rule; and;

89

(11) Award plaintiff their reasonable fees, costs, expenses, and disbursements, including attorney's fees, associated with this litigation; and

(12) Grant plaintiff such additional and further relief as the Court sees proper.


Dated: December 5, 2024

/s/ Erick G. Kaardal
Erick G. Kaardal, WI Atty. No. 1035141
Elizabeth A. Nielsen, MI Atty. No. P87437
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, MN 55402
Telephone:   (612) 341-1074
Email:kaardal@mklaw.com
Email: nielsen@mklaw.com